* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the opinion of award, except for minor modifications. Accordingly the Full Commission affirms the Opinion and Award of Deputy Commissioner Harris, with modifications.
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing, and in the executed Pre-Trial Agreement, as:
 STIPULATIONS
1. All parties are properly brought before the Industrial Commission, are subject to and bound by the provisions of the Workers' Compensation Act. The Commission has jurisdiction over the parties and of the subject matter, and an employer-employee relationship existed between plaintiff and Raleigh-Durham Airport Authority at the time of plaintiff's injuries.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties.
3. None of the parties in this action is appearing in a representative capacity.
4. There are no third party defendants or cross claimants.
5. Plaintiff's average weekly wage at the time of her injuries was $590.66, which yields a workers' compensation rate of $393.77.
 * * * * * * * * * * * EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Medical records (including Pages 46A-46P, submitted post-hearing)
 • Exhibit 3: Industrial Commission forms
 • Exhibit 4: Parties' discovery responses
 • Exhibit 5: Plaintiff's personnel file with Raleigh-Durham Airport Authority
 • Exhibit 6: Transcript of Plaintiff's June 20, 2003 recorded statement
 • Exhibit 7: Surveillance report
 • Exhibit 8: Documentation from Castalia Fire Department
 • Exhibit 9: Surveillance DVD
The following documents were accepted into evidence as Plaintiff's exhibits:
 • Exhibit 1: Earnings report from Bass Upholstery 2004-05
Transcripts of depositions of the following were also received post-hearing: Drs. David A. Browder, Shepherd F. Rosenblum and Joseph E. Roberts.
 * * * * * * * * * * * EVIDENTIARY RULINGS
The objections raised by counsel at the depositions taken in this matter are ruled upon in accordance with the law and the opinion in this Opinion and Award.
 * * * * * * * * * * *
Based upon all of the competent credible evidence of record and reasonable inferences flowing there from, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Virginia Bass filed this claim for injuries that occurred on or about May 15, 2003 and June 13, 2003 on Industrial Commission Forms 18 on or about September 3, 2003. Plaintiff filed a Motion for Consolidation of Claims on or about September 25, 2003 and the motion was granted on September 29, 2003. Defendants filed a Form 19 on or about July 1, 2003. Defendants filed a Form 61 denying plaintiff's claim for the May 15, 2003 injury on or about June 24, 2003. Defendants filed a Form 61 denying plaintiff's claim for the June 13, 2003 injury on or about November 12, 2003.
2. Plaintiff is 54 years old. She graduated from high school in 1970 and has an associate's degree in general education from Louisburg College and an associate's degree in fire technology from Durham Technical Community College.
3. Following her graduation from high school, plaintiff worked for varying lengths of time with the Tammy Lynn Center, as a cashier at a convenience store and doing clerical work for Piedmont Woodyards.
4. From about 1979 until 1991, plaintiff was self-employed, operating an upholstery shop out of her basement in Fuquay-Varina, North Carolina. Plaintiff worked on items such as car seats, boats, furniture, vinyl tops and trampolines. During this time, plaintiff also volunteered as a firefighter with the Fuquay-Varina Volunteer Fire Department.
6. Plaintiff began working for Raleigh-Durham Airport Authority in 1991 as a firefighter and emergency medical technician ("EMT") at the RDU Airport Fire Station.
7. As part of her work duties with Raleigh-Durham Airport Authority, plaintiff was expected to stay physically fit. To this end, there was exercise and weight-training equipment at the RDU Airport Fire Station that plaintiff and the other employees were expected to use as part of their work duties.
8. As of May 2003, plaintiff had previously used weights and the treadmill as part of her fitness routine with Raleigh-Durham Airport Authority. Around May 2003, some of the male firefighters with whom plaintiff worked began encouraging plaintiff to start using the weight bench as part of her exercise routine, and these fellow employees began giving plaintiff special instruction regarding the use of the weight bench.
9. On or about May 15, 2003, plaintiff was lifting weights using the weight bench when she started feeling pain in her left arm, just above the elbow. Plaintiff told her supervisor, Lieutenant Joe Vanroy, as well as other members of her crew, of this pain.
10. Plaintiff continued working at the fire station after developing the left arm pain. However, her pain got worse.
11. Plaintiff visited her family physician, Dr. David A. Browder, on June 9, 2003. On that date, plaintiff had multiple complaints, including her left elbow pain. With regard to the left elbow, Dr. Browder diagnosed lateral epicondylitis and recommended that plaintiff limit her activity with her left arm. Plaintiff informed Captain Kit Podger and other members of her crew as to what Dr. Browder had told her about her left elbow.
12. Plaintiff continued to work until June 13, 2003. On that day, plaintiff did her normal duties at the fire station, including cutting the grass with a push mower for about three hours in the afternoon. When plaintiff finished mowing, she had intense pain from her neck all the way down her left arm. Plaintiff informed her Captain that she could not continue to work that day, and she went home.
13. Plaintiff has not returned to work with Raleigh-Durham Airport Authority since June 13, 2003. Although she provided Raleigh-Durham Airport Authority with doctor's notes, there was no light-duty work available at the fire station, and, by letter dated October 21, 2003, Raleigh-Durham Airport Authority terminated plaintiff's employment. The letter read, in part, ". . . we understand that you are unable to resume work as a Firefighter at RDU. . . . we regrettably must consider you to have abandoned your job."
14. Upon referral from Dr. Browder, plaintiff began treating with Dr. Shepherd F. Rosenblum, an orthopedist at the Boice-Willis Clinic. On June 24, 2003, plaintiff presented to Ryan Clement, a physician's assistant with Boice-Willis, and presented the following history: Plaintiff had experienced left elbow pain for about six weeks after performing new exercises in her weight training; she had never experienced this type of pain before, and it progressed into left shoulder weakness. The day after mowing grass for about three hours she had pain going into the front of her left shoulder and had trouble lifting her left arm above her shoulder and reaching behind her back. Mr. Clement diagnosed plaintiff with stage II left lateral epicondylitis, stage I left shoulder impingement and left bicipital tendonitis, and he assigned activity restrictions for one month of no lifting/carrying over two pounds with the left arm and no overhead or repetitive use of the left arm. Mr. Clement prescribed exercises for plaintiff and gave her a tennis elbow band.
15. On July 23, 2003, Dr. Rosenblum noted that plaintiff's shoulder pain had improved somewhat, although she still had pain in her scapula region. Dr. Rosenblum gave plaintiff a cortisone injection for her left elbow and continued the same activity restrictions for two more weeks.
16. On August 6, 2003, Dr. Rosenblum saw plaintiff for a follow-up of what Dr. Rosenblum termed "left lateral epicondylitis and left cervical impingement." He noted that plaintiff's pain into her scapula was getting worse, and he injected her in her elbow and scapula. Dr. Rosenblum prescribed continued home therapy and continued the activity restrictions, with a lifting/carrying limit of 10 pounds.
17. On September 8, 2003, Dr. Rosenblum followed up with plaintiff for her left shoulder, neck and left elbow pain. He injected plaintiff again and continued her activity restrictions.
18. On October 8, 2003, Dr. Rosenblum saw plaintiff and noted that she had tried to drive a fire truck without power steering recently but that climbing in and out of the truck and trying to drive it caused increased pain in her left shoulder, and she was unable to do it. Dr. Rosenblum further noted that plaintiff's pain was worse along the levator scapular region and radiated somewhat from the scapula into the neck. Dr. Rosenblum placed activity restrictions of no lifting/carrying over 15 pounds and no climbing, and he referred plaintiff for pain management.
19. On October 14, 2003, plaintiff presented to Dr. Joseph E. Roberts, an anesthesiologist. Dr. Roberts noted plaintiff's history that she was suffering from pain in her left upper back and neck, with pain radiating into her left arm, and that the pain had acutely worsened after she cut grass for about three hours at work. Dr. Roberts assessed plaintiff with myofascial dysfunction pain syndrome, depression and a cervical HNP.
20. On October 21, 2003, Dr. Roberts, after reviewing a report from plaintiff's June 1997 cervical MRI that showed a herniated disk at C5-6, gave plaintiff the first in a series of three cervical epidural steroid injections.
21. In November 2003, plaintiff followed up with Dr. Roberts for the next two cervical ESIs. On November 6, 2003, plaintiff reported that the first ESI had provided about four days' full relief and that she was then feeling about "75 percent better." On November 19, 2003, plaintiff reported that her left shoulder pain was "80% better."
22. On February 3, 2004, Dr. Roberts noted that plaintiff's neck pain was better but that the pain in her left upper back and arm was now worsening again. Dr. Roberts continued with his diagnosis of cervical HNP and added cervical spondylosis. As such, through February and March 2004, Dr. Roberts administered another series of three cervical ESIs to plaintiff. On February 19, 2004, plaintiff reported that, following the first ESI on February 4, 2004, her pain was about "80% better" for several days but that the improvement in her pain was then "approximately 40%." On March 5, 2004, plaintiff reported being "80% better overall."
23. Plaintiff further treated with Dr. Roberts on July 29, September 9, September 22 and November 3 of 2004, administering more ESIs and discussing the possibility of surgery. On July 29, 2004, Dr. Roberts diagnosed plaintiff with cervical radiculopathy, in addition to his diagnoses as set out above.
24. Plaintiff has not received further medical treatment since November 2004 for her neck/left shoulder/left arm condition, other than an ongoing hydrocodone prescription written by Dr. Browder. She still has pain in her neck, left shoulder and left arm.
25. As Dr. Roberts testified, the relative success of the ESIs suggests that the range of plaintiff's left elbow, arm, shoulder and neck symptoms are related to her cervical HNP. The Full Commission finds as Dr. Roberts further testified, to a reasonable degree of medical certainty, the weight-lifting and grass-mowing that plaintiff engaged in as set out earlier in these Findings of Fact caused or significantly contributed to the condition for which Dr. Roberts treated plaintiff. The Full Commission further finds as Dr. Roberts further testified, the weight-lifting and grass-mowing aggravated plaintiff's pre-existing cervical HNP. Plaintiff's left arm and shoulder pain was radicular in nature and related to the cervical HNP with which Dr. Roberts diagnosed plaintiff.
26. The Full Commission finds as Dr. Rosenblum testified, to a reasonable degree of medical certainty, there is no reason to think that plaintiff's neck/left shoulder/left arm condition was caused by anything other than the weight-lifting and grass-mowing.
27. Among the physicians, the Full Commission assigns the most weight to Dr. Roberts' testimony on causation, since he is the specialist to whom Dr. Rosenblum referred plaintiff for treatment.
28. Plaintiff remains restricted from some types of work. Plaintiff cannot return to unrestricted work as a firefighter. Plaintiff did not improve enough under Dr. Roberts' care to return to work as a full-time firefighter.
29. On or about April 27, 2004, plaintiff slowly began to work in her upholstery business again. When furniture must be moved in connection with this business, plaintiff gets help from friends and neighbors. Through July 13, 2005, plaintiff had netted $1,722.79 in her upholstery business since re-starting it.
30. Plaintiff has volunteered with the Castalia Volunteer Fire Department for about the last ten years, but since May 2003, she has not performed full-duty with them; she performs secretarial functions and, on most of the calls she goes on, she oversees the "rehab truck," which provides first aid to anyone who is injured on the scene. Plaintiff does not climb ladders, wear an air pack, go in burning buildings, drag hose or do the other duties that a full-duty firefighter performs.
31. Despite being diagnosed with a herniated disk at C5-6 via the June 1997 MRI, plaintiff was able to work full-time with no restrictions in her job with Raleigh-Durham Airport Authority until the weight-lifting incident on or about May 15, 2003. She then was able essentially to perform her full duties with Raleigh-Durham Airport Authority for approximately another month, until the grass-cutting incident of June 13, 2003.
32. Raleigh-Durham Airport Authority has been unable to accommodate the activity restrictions related to plaintiff's neck/left shoulder/left arm condition through the provision of light-duty work or otherwise.
33. The weight-lifting incident on or about May 15, 2003 and the grass-cutting incident on June 13, 2003 were specific traumatic incidents within the meaning of N.C. Gen. Stat. § 97-2(6). As a result of these specific traumatic incidents, plaintiff suffered a compensable aggravation of her pre-existing cervical herniated disk that caused her disability.
34. Plaintiff has shown that she is disabled as a result of the work-related aggravation of her pre-existing cervical herniated disk, in that since June 13, 2003, she has only been able to obtain employment making much less than she made with Raleigh-Durham Airport Authority. Raleigh-Durham Airport Authority has failed to produce any evidence that suitable employment is currently available to Plaintiff.
35. Defendants have heretofore denied both of plaintiff's claims and have not provided medical treatment for plaintiff. Plaintiff has requested that Drs. Browder, Rosenblum and Roberts be designated as her treating physicians.
36. All of the medical treatment that plaintiff has heretofore received with Drs. Browder, Rosenblum and Roberts has been medically necessary for the treatment of plaintiff's neck/left shoulder/left arm condition. Further treatment with these physicians will tend to effect a cure, provide relief and/or lessen the period of plaintiff's disability.
37. Defendants engaged in surveillance of plaintiff that was conducted on three separate dates, April 12, April 13 and April 30, 2005. The surveillance company followed plaintiff and made video documentation. The video provided is approximately 31 minutes long. Of this time, approximately 21 minutes are of plaintiff eating in a fast food restaurant, approximately five minutes are spent at Wal-Mart, approximately one minute is at Dollar Stores, and the remainder is plaintiff traveling in her mini van. The surveillance shows nothing that contradicts plaintiff's evidence of disability.
38. Defendants did not defend this matter without reasonable grounds.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered compensable specific traumatic incidents to her back on or about May 15, 2003 and June 13, 2003. N.C. Gen. Stat. §97-2(6).
2. Plaintiff's neck/left shoulder/left arm condition is compensable. When a pre-existing, non-disabling, non-job-related condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment so that disability results, then the employer must compensate the employee for the entire resulting disability, even though it would not have disabled a normal person to that extent.Morrison v. Burlington Industries, 304 N.C. 1 (1981). Aggravation of a pre-existing condition caused by a work-related injury is compensable under the Workers' Compensation Act. Smith v. Champion Intl.,134 N.C. App. 180, 182, 517 S.E.2d 164, 166 (1999). "The work-related injury need not be the sole cause of the problems to render an injury compensable. If the work-related accident contributed in some reasonable degree to plaintiff's disability, she is entitled to compensation."Hoyle v. Carolina Associated Mills, 122 N.C. App. 462, 465-66,470 S.E.2d 357, 359 (1996); Ruffin v. Compass Group USA,150 N.C. App. 480, 563 S.E.2d 633 (2002).
3. Plaintiff is entitled to compensation for temporary total disability at the rate of $393.77 per week for the period from June 14, 2003 through April 26, 2004. Plaintiff's medical evidence proved that she was unable to work during that period of time. Russell vs. LowesProducts Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457
(1993); N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to compensation for temporary partial disability for the period from April 27, 2004 until she regains her pre-injury wage-earning capacity or 300 weeks from June 14, 2003, whichever occurs first. Plaintiff met this burden by proving that she had obtained other employment at a wage less than that earned prior to the injury. Russell vs. Lowes Products Distribution, 108 N.C. App. 762,765, 425 S.E.2d 454, 457 (1993); N.C. Gen. Stat. § 97-30.
5. Plaintiff is entitled to reimbursement in full of all medical expenses she has personally incurred for treatment of her neck/left shoulder/left arm condition with Drs. Browder, Rosenblum and Roberts. Plaintiff is further entitled to have defendants pay for further treatment for her compensable condition with Drs. Browder, Rosenblum and Roberts. N.C. Gen. Stat. § 97-25. As a general rule, an employer has the right to direct the medical treatment for a compensable work injury.Kanipe v. Lane Upholstery, Hickory Tavern Furniture Co.,141 N.C. App. 620, 623-24, 540 S.E.2d 785, 788 (2000). However, "an employer's right to direct medical treatment (including the right to select the treating physician) attaches [only] once the employer accepts the claim as compensable." Id. at 624, 540 S.E.2d at 788; see alsoBailey v. W. Staff Servs., 151 N.C. App. 356, 363,566 S.E.2d 509, 514 (2002) andCraven v. VF Corp., 606 S.E.2d 160, 163 (N.C.Ct.App. 2004) The Industrial Commission may, at any time, upon the request of employee, order a change of treatment and designate other treatment suggested by the plaintiff, subject to the Industrial Commission's approval. If he so desires, an injured employee may select a physician of his own choosing to attend, prescribe and assume the care and charge of his case, subject to the approval of the Industrial Commission. N.C. Gen. Stat. § 97-25
(2004). Plaintiff asked that Dr. Browder, Dr. Rosenblum, and Dr. Roberts be approved as her authorized treating physicians. Plaintiff's request was sought within a reasonable time. See Forrest v. Pitt County Bd. ofEducation, 100 N.C. App. 119, 126, 394 S.E.2d 659, 663 (1990);Scurlock v. Durham County Gen. Hosp., 136 N.C. App. 144, 152,523 S.E.2d 439, 444 (1999; and Thompson v. Fed. Express Ground,623 S.E.2d 811 (N.C.Ct.App. 2006).
6. Plaintiff is not entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney's fee provision below, defendants SHALL immediately pay plaintiff, in a lump sum, temporary total disability compensation in the amount of $393.77 per week for the period from June 14, 2003 through April 26, 2004.
2. Subject to the attorney's fee provision below, defendants SHALL immediately pay plaintiff, in a lump sum, 66 2/3 percent of the difference between plaintiff's pre-injury average weekly wage and the amount that plaintiff has netted from her upholstery business, for the period from April 27, 2004 through the present.
3. Subject to the attorney's fee provision below, defendants SHALL continue to pay plaintiff ongoing temporary partial disability compensation until further Order of the Commission or until 300 weeks from the date of the injury, whichever occurs first.
4. As Plaintiff's attorney's fee, defendants SHALL pay 25 percent of the lump sums set out in Paragraphs 1 and 2 above directly to plaintiff's counsel. As further plaintiff's attorney's fee, defendants shall pay 25 percent of each ongoing amount due per Paragraph 3 above payable directly to plaintiff's counsel.
5. Defendants SHALL reimburse plaintiff in full for the out-of-pocket expenses she has incurred for the treatment of her compensable neck/left shoulder/left arm condition with Drs. Browder, Rosenblum and Roberts.
6. Drs. Browder, Rosenblum and Roberts are hereby designated as plaintiff's treating physicians, and, subject to the limitations period set out in N.C. Gen. Stat. § 97-25.1, Defendants SHALL authorize and pay for the treatment that any of said physicians recommends for plaintiff's compensable neck/left shoulder/left arm condition, including but not limited to diagnostic testing.
7. Defendants shall pay all the costs, including but not limited to expert witness fees in the following amounts: $410.00 to Dr. Rosenblum; $650.00 to Dr. Roberts; and $260.00 or the amount actually billed, whichever is less, to Dr. Browder.
This 28th day of December 2006.
 S/___________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRIS SCOTT COMMISSIONER